UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TANAKA MAWINDI,<br><br>                              Plaintiff,<br><br>     - against –<br><br>TECHSTARS CENTRAL, LLC, TRINET and<br>GARY STEWART,<br><br>                              Defendants. | Civil Case No.<br><br>**VERIFIED COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

Plaintiff Tanaka Mawindi ("Plaintiff" or "Mawindi"), by and through her attorneys, SHEGERIAN & ASSOCIATES, as and for her Complaint against Defendants, Techstars Central, LLC ("Defendant" or "Techstars"), TriNet ("Defendant" or "TriNet") and Gary Stewart ("Defendant" or "Stewart") states and alleges on information and belief as follows:

## PRELIMINARY STATEMENT

1.     Defendants Techstars, TriNet and Stewart engaged in intentional discrimination against Plaintiff based on her race, color and/or national origin and gender and retaliation. Despite Plaintiff's repeated complaints of discrimination and retaliation, she experienced a hostile work environment perpetuated by Defendant Stewart's behavior and derogatory comments, Techstars' worsening of her work conditions following her complaint of discrimination, as well as TriNet's involvement providing Human Resources ("HR") services to Defendant Techstars directly affecting Plaintiff's terms and conditions of employment and perpetuating the discrimination and retaliation towards Plaintiff. Moreover, all Defendants retaliated against Plaintiff after she opposed the discrimination and harassment she endured and after seeking reasonable accommodations during her employment. This pattern of discrimination and retaliation culminated in Plaintiff's wrongful termination on June 1, 2023, without any severance, under the

pretext of "deteriorating conditions" in her working relationship with Defendants Stewart, her direct supervisor at the time of her termination. This termination occurred despite the absence of any formal disciplinary action against Plaintiff throughout her employment and in spite of her stellar performance, highlighting the discriminatory and retaliatory nature of all Defendants' actions.

## NATURE OF THE ACTION

2.     This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq.* ("Title VII"), the New York State Executive Law ("NYSHRL") § 296, *et seq.* and the New York City Administrative Code § 8-107, *et seq.* ("NYSHRL") to remedy discrimination based upon race, color and/or national origin and gender as well as retaliation. Plaintiff Mawindi brings this action against Defendants for economic, non-economic, compensatory and punitive damages, pre-judgment interest and costs and reasonable attorneys' fees, and such other and further relief as this Court deems equitable and just.

3.     Plaintiff, an Investment Associate hired by Defendant Techstars complains that Defendants unlawfully discriminated against her on the basis of her gender, race, color and/or national origin  by treating her less favorably in her terms and conditions of employment than her counterparts, ignoring her complaints opposing discrimination and harassment by her Manager, Defendant Stewart, after being informed of his derogatory remarks made in regards to Plaintiff's appearance and professionalism, retaliated against and defamed her after Defendants orchestrated a series of events to facilitate her unlawful termination under the pretext of "deteriorating conditions" in her working relationship with Defendant Stewart.

## JURISDICTION AND VENUE

4.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C.§ 2000e-5(f)(3) and 42 U.S.C. §§ 1981, 1983. This Court has supplemental jurisdiction over

Plaintiff's New York State statutory causes of action prohibiting discrimination pursuant to 28 U.S.C. § 1367(a).

5.    Plaintiff asserts supplemental State law claims pursuant to the New York State Constitution and New York Executive Law § 296, *et seq*.

6.    Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and application and enforcement of Defendants' equal employment opportunity ("EEO") policies, affecting the hiring, promotion, work assignments, discipline and termination of its employees, may be found in this District.

7.    All conditions precedent to jurisdiction have occurred or been complied with including, and in particular:

a.    Within the time prescribed by law, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against Techstars alleging violations of federal law as well as a separate Charge of Discrimination against TriNet. See attached hereto as **Exhibits A** and **B**, the two Dismissal and Notices of Right to Sue issued by the EEOC pertaining to each Charge.

8.    On or around June 21, 2024, a copy of this Complaint was mailed to the New York State Division of Human Rights and the New York State Department of Labor, thereby satisfying the notice requirements of the New York State Human Rights Law and N.Y. Civ. Rights § 40-d**.**

## JURY DEMAND

9.    Pursuant to the Seventh Amendment of the United States Constitution and pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint.

## PARTIES

10.     *Plaintiff:*  Plaintiff Mawindi is currently a resident of the State of Pennsylvania, and at all times mentioned in this Complaint was, was a resident of the States of New York and Pennsylvania throughout her employment with Defendants through the date of her termination. .

11.     Plaintiff had been continuously employed by Defendant Techstars from November 16, 2022 until the date of her termination on June 1, 2023.

12.     *Defendants:* Defendant Gary Stewart is, and at all times mentioned in this Complaint was, on information and belief, a resident of the State of New York.

13.     Upon information and belief, Defendant Stewart, Plaintiff's Manager, individually and in his official capacity, an agent, employee, licensee, servant, supervisor and manager in charge of supervising Investment Associates was employed by Defendant Techstars.

14.     Upon information and belief, Defendant Stewart, as a Manager, individually and in his official capacity, acted as an agent, employee, licensee, servant, supervisor and manager in charge of supervising Investment Associates to work for Defendant Techstars with all the actual and/or perceived/apparent authority granted, allotted and entrusted to him by Defendant Techstars in accordance with his official duties, position, rank and title as an employee of Defendant company.

15.     Upon information and belief, Defendant Stewart, who is sued in his individual and official capacity as a Manager supervising Plaintiff, acted under color of law and within the scope of his employment, to wit: under color of statutes, ordinances, regulations, policies, customs, and usages of the State of New York and/or Federal statutes.

16.     Upon information and belief, Defendant Techstars owned, managed, controlled, maintained, employed and/or supervised Defendant Stewart, individually and in his official

capacity as a Manager.

17.    Upon information and belief, at all relevant times, Defendant Techstars is an employer as that term is used in Title VII, the NYSHRL and NYCHRL.

18. Upon information and belief, at all relevant times, Defendant Techstars is an employer as that term is used in Title VII, the NYSHRL and NYCHRL because it has four (4) or more employees in its employ and conducts business in the State of New York.

19.    Upon information and belief, Defendant Techstars is a corporation duly organized and existing under and by virtue of the laws of the State of New York with its principal office at 25 West 45th St., 15th Floor. New York City, New York 10036, and a corporate office where Plaintiff was employed during her employment located at 214 W 29th Street, New York, New York 10001.

20.    Upon information and belief, at all relevant times, Defendant Techstars, is, and at all times mentioned in this Complaint was, authorized to operate by the State of New York and the United States government and authorized and qualified to do business in the County of New York, State of New York. Defendant's place of business, where the following causes of action took place, is and was, in Manhattan located within the Southern District of New York.

21.    Upon information and belief, at all relevant times, Defendant Techstars, is, and at all times mentioned in this Complaint was, authorized to operate by the State of New York and the United States government and authorized and qualified to do business in the County of New York. Defendant's place of business, where the following causes of action took place, was and is, in the Southern District of New York at 214 W 29th Street, New York, New York 10001.

22.    Defendant TriNet is a corporation duly organized and existing under and by virtue of the laws of the State of California with its principal office located at One Park Place, Suite 600,

Dublin, California. TriNet provides HR services to small and midsize businesses, acting as a co-employer for purposes of administering payroll, benefits and other HR functions meaningfully affecting the terms and conditions of Plaintiff's employment at Techstars.

23.     Defendants Techstars and TriNet maintain a unique employment governance relationship *i.e.* a Professional Employer Organization ("PEO"), which is a negotiated agreement signed between the two Defendant entities meant to outsource compliance risks and Human Resources administration to TriNet, which afforded TriNet supervisory and/or decision making authority over Plaintiff directly affecting the terms and conditions of her employment with Defendants.

24.     Upon information and belief, at all relevant times, Defendant TriNet is an employer as that term is used in Title VII, the NYSHRL and NYCHRL, and at all times mentioned in this Complaint was authorized to operate by the State of California and the United States government and authorized and qualified to do business in the Southern District of New York within the State of New York.

25.     *Relationship of defendants:*   All Defendants compelled, coerced, aided, and/or abetted the discrimination, disparate treatment, harassment, retaliation, aiding and abetting resulting in wrongful termination alleged in this Complaint, which conduct is prohibited under federal law including, but not limited to, Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, *et seq*., the NYSHRL and NYCHRL. All Defendants were responsible for the events and damages alleged herein, including on the following bases: (a) Defendants committed the acts alleged; (b) at all relevant times, one or more of the Defendants was the agent or employee, and/or acted under the control or supervision, of one or more of the remaining Defendants and, in committing the acts alleged, acted within the course and scope of such agency and employment

and/or is or are otherwise liable for Plaintiff's damages; (c) at all relevant times, there existed a unity of ownership and interest between or among two or more of the Defendants such that any individuality and separateness between or among those defendants has ceased, and defendants are the alter egos of one another. Defendants exercised domination and control over one another to such an extent that any individuality or separateness of Defendants does not, and at all times herein mentioned did not, exist. Adherence to the fiction of the separate existence of Defendants would permit abuse of the corporate privilege and would sanction fraud and promote injustice. All actions of all Defendants were taken by employees, supervisors, executives, officers and directors during employment with all Defendants, were taken on behalf of all Defendants, and were engaged in, authorized, ratified and approved of by all other Defendants.

26.     Defendant Techstars both directly and indirectly employed Plaintiff as defined by federal law including, but not limited to, Title VII, the NYSHRL and NYCHRL.

27.     Defendant TriNet both directly and indirectly employed Plaintiff as defined by federal law including, but not limited to, Title VII, the NYSHRL and NYCHRL.

28.     Defendant Stewart both directly and indirectly employed Plaintiff as defined by federal law including, but not limited to, Title VII, the NYSHRL and NYCHRL.

29.     Finally, at all relevant times mentioned herein, all Defendants acted as agents of all other Defendants in committing the acts alleged herein.

## STATEMENT OF FACTS

30.     *Plaintiff's hiring:* On or about November 16, 2022, Plaintiff Mawindi was hired for the position of Investment Associate with Defendant Techstars with Defendant Stewart as her direct manager. During her employment, Plaintiff was subjected to a series of discriminatory actions and derogatory remarks based on her race, color and national origin as well as gender,

which she opposed through complaints culminating in her wrongful termination on June 1, 2023. Despite Plaintiff's qualifications and positive performance reviews, her working relationship with Defendant Stewart deteriorated due to his discriminatory behavior and retaliatory actions. Plaintiff's complaints to the Human Resources ("HR") department and subsequent filing with the Equal Employment Opportunity Commission ("EEOC") highlighted the ongoing discriminatory practices and hostile work environment perpetuated by Defendants placing them on notice.

31.    Plaintiff Mawindi was a qualified employee of Defendant Techstars, beginning her employment on November 16, 2022 as an Investment Associate under the "Techstars New York City powered by JP Morgan" program. Her duties included managing startup investment companies, running a 13-week coaching program for said startups, and engaging with stakeholders within and external to the firm. Plaintiff was a dedicated employee who performed her job in a satisfactory manner.

32.    *Plaintiff's job performance:* Plaintiff Mawindi was a diligent, hardworking employee at Defendant Techstars until her termination on June 1, 2023. Despite receiving generally positive performance reviews and not having any disciplinary actions recorded, her employment was terminated following what has been described as a "communication breakdown" and "deteriorating conditions" in her working relationship with her former manager, Defendant Stewart.

33.    Throughout her tenure at Defendant Techstars, Plaintiff received verbal performance evaluations from Defendant Stewart, a verbal performance evaluation from Techstars' Senior HR Business Partner, Michael Young, and a written performance evaluation/survey from the startups she managed and coached during the 13-week program. .

34.    *Plaintiff's protected status and activity:* Plaintiff, as a Black female born in

Zimbabwe, was subjected to discrimination based on her gender, race, color and national origin and disparate treatment compared to her colleagues, and harassment. She faced retaliation after lodging good faith complaints about the discrimination and harassment she experienced, which ultimately led to her wrongful termination. Despite the absence of any formal disciplinary action against her, the working relationship with her manager, Defendant Stewart, was cited, in her June 1 2023 dismissal call and email, as a "communication breakdown" and "deteriorating conditions," leading to her dismissal, where Defendant alleged they were "unable to find another work placement" for her internally. Note that in January 2024, 8 months post-termination during the EEOC investigation process, the Defendants shifted/changed their reasons for termination, stating Plaintiff was terminated for "work performance" and being "insubordinate" to her Manager.

35.     *Defendants' adverse employment actions and behavior:* in or about December 2022, approximately one (1) month after commencing employment, Plaintiff experienced blatantly bullying behavior from Defendant Stewart, her direct manager. One of her teammates at the time, Vana Koutsomitis, who was initially hired to be an Investment Principal but reneged on her offer before her official start date, even though had been working with the team for over three (3) months, confided in Plaintiff that Stewart, a Jamaican-American Black male who wears blue contact lenses and has lived in Europe for 20+ years, did not want to hire Plaintiff. Instead, he wanted to hire "the white Guy from Harvard" who reneged on his offer and that prior to Plaintiff's hiring and during the interview process, Stewart told teammembers at the time that Plaintiff's "hair is unprofessional and ghetto", and it appears like she is wearing a "turban".

36.     During her employment, Stewart asked Plaintiff in front of other team members, "Did you forget to do your hair this morning?" prior to a virtual meeting commencing because her camera was off.

37.     At the time the derogatory comments were made by Stewart, Plaintiff was sporting her natural hair, which was a pixie cut. She thereafter started wearing weaves to avoid Stewart's ridicule.

38.     Plaintiff's teammates also told her Stewart disclosed to them her salary, stating, in sum and substance, how cheap it was to get her onboard.

39.     In or about early February 2023, Plaintiff started being excluded from key team events and witnessed Stewart's worsening hostile and unpredictable behavior. After organizing a pivotal investor meeting, Stewart instructed Plaintiff not to attend. Stewart then missed a scheduled meeting with Plaintiff without explanation and later asked to reschedule. Furthermore, Stewart prematurely involved a colleague by the name "Cord" in team calls before his official start date. An unusual late-night email from Stewart to Plaintiff and Investment Principal, Jonathan Mo ("Mo") raised concerns about Stewart's professionalism.

40.     On or about February 16, 2023, Plaintiff was subjected to differential treatment by Stewart, who demanded that Plaintiff commute biweekly from Pennsylvania, unlike the daily attendance of other team members. In that Feb 16, 2023 meeting Stewart outright objected to subsidize Plaintiff's accommodations to facilitate daily attendance in office even though Plaintiff indicated the cost of monthly accommodations versus biweekly travel would be about the same. Stewart yelled and threatened the Plaintiff : "Don't try me…Don't try me. We can do this the easy way by me talking to senior leadership, or you can do what I ask. Your promotion in this job is not related to just your performance—your work is great—it's about whether I like you." Stewart's inflexible stance softened only after Plaintiff provided evidence of similar housing subsidies granted to other teams, leading to Stewart's concession on February 20, 2023.

41.     On or about February 21, 2023, Plaintiff was once again sidelined from crucial

work-related events. Despite receiving a direct invitation, Plaintiff was not informed by Stewart about a New York City investment team members' dinner organized by Nate Schmidt ("Schmidt"), then acting General Manager for Americas East at Techstars. Upon notifying Stewart of her intention to attend, he was surprised and irritated.

42.    Additionally, Defendant Stewart discouraged Plaintiff from participating in a meeting with the law firm Cooley taking place the day after the Schmidt dinner, which Plaintiff had arranged. This pattern of behavior reinforced Plaintiff's concern that Stewart was attempting to diminish her role and make her redundant.

43.    In or about February through March 2023, Plaintiff was subjected to unequal and excessive demands by Stewart. Plaintiff was frequently required to redo work that was sufficiently completed, work until the early hours of the morning e.g. 3 a.m. and manage overbooked venues, which he did not ask of others who were not Black female employees, ultimately leading to a loss of cooperation with one (1) venue due to room capacity issues—a concern Plaintiff had previously raised to Stewart.

44.    Despite challenges Plaintiff experienced during her employment and significant achievements, including securing a substantial 70% discount at a coveted resort for a founder retreat, Stewart's actions conveyed an impression that Plaintiff's contributions were insufficient in an attempt to pressure Plaintiff into resignation.

45.    Between on or about March 30, 2023 to April 2, 2023, during a retreat hosted by Defendants at Gurney's Resort in Montauk, New York, Plaintiff was subjected to an aggressive outburst from Stewart. This incident occurred in public to the surprise of over a dozen witnesses, including hotel personnel, startup founders, Jonathan Mo and Cordelro Brown, prompting Stewart's spouse to intervene due to the commotion caused. The altercation was reportedly over

Plaintiff being allocated what Stewart considered a superior room by the hotel, which he mistakenly believed was self-assigned by Plaintiff, despite confirmation of random assignment by hotel personnel.

46.     Throughout the retreat, Stewart persistently questioned Plaintiff's whereabouts each morning, contradicting their prior agreement on meeting times, a behavior corroborated by Jonathan Mo ("Mo") and Cordelro Brown ("Cord").

47.     On or about April 3, 2023, Plaintiff was informed by Stewart in a one-on-one meeting that she would now be reporting to Mo due to the "friction" between them.

48.     On or about April 19, 2023, Stewart attempted to alter Plaintiff's performance targets during a pivotal meeting between the two (2) of them. Stewart challenged Plaintiff's understanding of the sourcing target, asserting it was 2,000 despite previous agreement on 1,500, which was well documented in a team meeting at the Yale Club of New York City. Stewart's subsequent outburst stunned Plaintiff: he informed her that she was doing excellent work, but that he would be giving her a negative review because of her "looks" and the "way she looked at him." He went on to say that he finds the way she looks at him "aggressive" and "makes him uncomfortable." He threatened her job, stating, "one of us will have to go and it won't be him." Plaintiff reasonably understood Stewart's language to be based on her sex and race, as a Black woman, often stereotyped as "aggressive" and "angry." This meeting led to Plaintiff's concern for her job safety, and she felt his conduct was now without a doubt discriminatory behavior. This incident prompted Plaintiff to schedule a meeting with Senior HR Business Partner, Michael Young ("Young") for April 21, 2023.

49.     On or about April 21, 2023, Plaintiff reported to Young feeling "unsafe" and "harassed" by Stewart. Plaintiff detailed instances of Stewart's behavior that were perceived as

discriminatory and threatening, including a refusal to subsidize housing, an outburst over room assignments at a company retreat and the directive to report to a new manager due to alleged friction. Plaintiff expressed concern that Stewart's comments about her demeanor as a Black female perpetuated negative racial stereotypes.

50.     Plaintiff complained to Young, "[i]n all my 7 plus years of working I have never had anyone in a professional context comment on my looks or the way I look at them or don't look at them…Gary's saying I come across as aggressive and make him uncomfortable…Honestly it just feels like Gary's trying to fire me… I feel harassed.... I don't feel safe here…As a Black woman, I feel Gary is perpetuating stereotypes about Black women being aggressive."

51.     Furthermore, Young indicated that if Plaintiff's account was accurate, such behavior would be unacceptable and warrant investigation. He planned to discuss the matter with Stewart and advised Plaintiff to submit any evidence she had.

52.     On or about April 24, 2023, during a team meeting, Stewart announced that Young would join as a mentor for startups in their program. Plaintiff became concerned that this would create a conflict of interest.

53.     Later that day on April 24, 2023, following this team meeting, Stewart missed a scheduled one-on-one weekly meeting with Plaintiff, claiming he was not aware they had a meeting. Stewart did not attend any subsequent one-on-ones with Plaintiff thereafter following her complaint to HR/Young.

54.     On or about the evening of April 28, 2023, Plaintiff and her teammates observed Stewart closely monitoring her arrival and departure times to and from work. That same day, Young contacted Plaintiff via Slack to schedule a call for May 1, 2023, which was his first

communication with Plaintiff ten days following her initial complaint.

55.     On or about May 1, 2023, Young alledged that before he'd had a chance to share Plaintiff's concerns with Stewart, Stewart had "reached out to HR independently" following Plaintiff's complaint to share his own concerns. Young offered for HR to investigate Plaintiff's claims through team interviews or mediation. Plaintiff expressed openness to mediation versus team member interviews because she feared Defendant would retaliate against team members speaking positively on her behalf  based on Stewart's threats to her teammates in separate meetings that they were either "Team Gary" or "Team Tanaka." Despite her concerns about Stewart's malicious intentions and reported additional issues, including Stewart's refusal to communicate with her/communication breakdown, threats of Plaintiff's termination communicated to Plaintiff's colleagues, along with delayed expense reimbursements causing her financial hardship, Plaintiff cooperated in Mr. Young's supposed attempts to "mediate" the situation. No such mediation ever occurred because Mr. Stewart refused to participate. On or about May 4, 2023, Stewart declined to engage in mediation, which he communicated via email to Young and Plaintiff. Subsequently, Ms. Mawindi began to be significantly excluded from key work events, meetings, and systems.

56.     On or about May 5, 2023 Plaintiff engaged in a discussion with Julie Semple ("Semple"), a business consultant from Defendant TriNet, who seemingly expressed a preliminary interest in sponsoring a dinner for the startup cohort. This outreach by Semple was perceived as unusual by Plaintiff, considering the timing was after she lodged her complaint, and the fact that most partners had already committed to sponsorships prior to the program's commencement. The extended conversation with Semple on or about May 5, 2023 appeared to be an evaluation of Plaintiff. Subsequent communication from Semple did not materialize into

sponsorship arrangements but coincided closely with Plaintiff's impending system access revocation, suggesting a potential connection to the earlier complaint.

57.     On or about May 8, 2023, it was reported that Alexandra Koutsomitis, a graphic designer, resigned from her position after expressing concerns about unfair treatment and payroll issues. She attributed these issues verbally and in writing to Stewart's actions, which she expressed were unjustly blamed on Plaintiff by Stewart, despite Plaintiff not being in charge of her payroll. This incident was reported to Young by Plaintiff.

58.     On or about May 9, 2023, while dealing with a family emergency, Plaintiff received an email from Vance Dekker, a White male who Stewart had contracted for "PR activities" who then went on to replace Plaintiff as Investment Associate following her termination. In that email, Vance Dekker inquired to Plaintiff about Alexandra Koutsomitis's resignation and her worked overtime hours. Plaintiff clarified that she had no oversight over Koutsomitis's hours or her payroll, as Stewart was the hiring manager responsible for her Upwork account. Plaintiff expressed surprise at Koutsomitis's resignation and concern over being implicated in issues outside her purview. Plaintiff escalated the matter to the HR department, copying Young on the email.

59.     Furthermore, Plaintiff communicated these concerns to Young later that day on May 9, 2023 via Slack message, lamenting Stewart engaging in defamation against her to specific contractors, and also inquiring about the sudden revocation of her Upwork system access, a system she used daily to manage and pay contractors. Young's initial expression of unawareness of the issue, despite being the Upwork point person, furthered Plaintiff's suspicion of being undermined by the Defendant. Plaintiff emphasized the worsening "deteriorating" work environment and sought clarification on the status of mediation involving Stewart. Following this,

Plaintiff's system access was restored, and HR scheduled a meeting for May 12, 2023.

60.     On or about May 10, 2023 to May 16, 2023, Samuel Alonge ("Alonge"), a Nigerian male founder who had provided a negative evaluation of Stewart, was removed from the program. This action was reportedly facilitated by Stewart with the assistance of Nate Schmidt and Tami Nelson (at that time, the Director of JP Morgan Programs at Techstars), following Alonge's survey feedback which described Stewart as "toxic," "a bully," and "discriminatory."

61.     On or about May 12, 2023, in the scheduled meeting between Young and Plaintiff, Young informed Plaintiff that HR would not intervene in her relationship with Mr. Stewart. Rather, they planned to force her to leave her current cohort of start-ups early, despite her objections that this itself was retaliatory, if another manager agreed to take her on. Young suggested an immediate team change was necessary due to "communication breakdown" and "deteriorated conditions," which posed a risk to program delivery." Plaintiff objected, citing her critical role to program delivery and stellar performance. HR acknowledged that performance was not the issue.

62.     On or about May 13, 2023, Plaintiff emailed HR to contest the proposed team change during program, emphasizing its unfairness and non-performance-related nature. HR replied, confirming the situation was not performance related and attributing the situation to 'Wrong Manager,' i.e. Stewart.

63.     On or about May 13, 2023 to May 19, 2023, Plaintiff corresponded with HR, agreeing to interview with Keith Camhi ("Camhi"), then Managing Director for another Techstars program, for a potential lateral move. HR provided a general job description of the Investment Associate role when Plaintiff asked for Camhi's job requisition, and scheduled an interview for May 23, 2023 with a commitment to consider other positions "over the next few weeks" if a lateral

move to Camhi's team did not pan out.

64.     On or about May 23, 2023, Plaintiff interviewed with Camhi, who was seeking a candidate with a "strong founder background" for the Investment Associate role, which is a role at Techstars typically not requiring such experience. Despite Plaintiff's relevant strong founder background in fact, Camhi decided to continue his search without extending an offer. Plaintiff then reached out to HR to discuss the interview, and HR proposed a follow-up call for May 24, 2023 or May 25, 2023. Notably, the individual eventually hired for the position, a White Latin male named Felipe Rubio,  lacked the founder background that Camhi had emphasized.

65.     Defendant Stewart was no longer employed with Techstars as of January 10, 2024, and Camhi had taken over his role.

66.     On or about May 26, 2023, after a lack of response from HR, Plaintiff sent a follow-up message via Slack, to which she did not receive a response until May 31, 2023. Please note that the following week of May 30th, Plaintiff was not invited to San Francisco Tech Week while the rest of the team, including her junior, Cord, and the startups attended. Plaintiff was responsible for securing the program's participation in SF Tech Week and was working with SF Tech Week organizers on planning, but was uninvited from the event just two weeks before it on May 16, strongly suggesting the Defendants had no plans to move her to another team as they alleged and instead worked to terminate her from the outset.

67.     *Termination of Plaintiff's Employment*: Young replied on May 31, 2023 citing its out-of-office days and scheduled a meeting for June 1, 2023. During this meeting, roughly one month after Plaintiff had filed her original discrimination and harassment claim against Stewart with HR, HR informed Plaintiff that she should be "involuntarily terminated"  due in sum and substance to "a communication breakdown,"  "deteriorated conditions," and "inability to find

another work placement," albeit with respect to the latter, other teams, such as Techstars Oakland, attempted to poach Plaintiff prior to her termination, expressing urgent need on their team. Plaintiff met with team members of Techstars Oakland both virtually and in person several times between June and July 2023, at their request, who proceeded to ask her in these meetings whether she'd consider coming onboard their team as an additional Investment Associate (before Plaintiff was terminated) or as a contractor (after Plaintiff was terminated). Young informed Plaintiff her system access would end on June 6, 2023 but that her official payroll termination would be effective on June 16, 2023.

68.     On or about June 5, 2023, Semple from Defendant TriNet reconnected with Plaintiff over email, coinciding with Plaintiff's impending system access revocation. The same day, Plaintiff expressed disappointment to Young regarding her termination, citing harassment concerns related to race and gender. Young then denied receiving such a complaint, leading to a series of exchanges until June 6, 2023.

69.     Following her termination, Defendants further retaliated by hindering Plaintiff's ability to gain subsequent employment and hindering her timely access to unemployment compensation, which caused undue financial hardship. After being terminated, Plaintiff interviewed with the following venture capital firms: MetaProp VC, Supply Change Capital, BK-XL Accelerator, CareFirst/Healthworx Ventures.

70.     Upon information and belief, the managing partner, Aaron Block ("Block") at the firm was all set to hire Plaintiff as a contractor and asked for a list of her references. He mentioned he was close friends with former Defendant Techstars's then Chief Executive Officer, Maelle Gavet. He then proceeded not to hire Plaintiff giving the reasoning it would be "an end of year distraction" for the firm, and when Plaintiff followed up at the start of the year, Block was non-

responsive.

71.     Plaintiff applied to a position with Supply Change Capital ("Supply") and was in the final interview rounds. It appeared to Plaintiff she was likely to be offered the job. Upon information and belief, Supply had a conversation with Jason Torres ("Torres"), a Techstars-affiliated investor who had feigned to be Plaintiff's mentor over the course of 8 months while acting as Stewart's friend and close confidante, attempting on several occasions to have Plaintiff drop her legal case and going so far as to insist Plaintiff speak with his own counsel, counsel who also instructed Plaintiff to "do whatever it takes to negotiate" and drop her legal case. Torres initially denied speaking to Supply about Plaintiff but after Plaintiff inquired further, he admitted the conversation. Supply then proceeded not to hire Plaintiff.

72.     After her termination, Plaintiff spoke with BK-XL Accelerator's Managing Director, Chris Martinez ("Martinez"), after being referred to the available Investment Principal position and Martinez inviting her for an introductory conversation. After a couple of weeks, Martinez then emailed Plaintiff informing her the firm wouldn't be moving forward with her application even though she hadn't formally applied.

73.     Upon information and belief, Plaintiff later became aware Martinez knows Defendant Stewart quite well.

74.     After separating from Defendants, Plaintiff applied twice to CareFirst/Healthworx Ventures ("CareFirst") and was rejected. However, a month later, she received an invitation to interview. The head of the group, Emily Durfee, was connected with Jason Torres. She had a first interview with Emily Durfee. After three weeks, Plaintiff was notified another interview would be scheduled with Ms. Durfee, which was not a part of the company's hiring process it initially outlined to Plaintiff.

75.    In the next interview with Ms. Durfee, she asked Plaintiff to identify which program she was affiliated with at Techstars and proceeded to ask, "Remind me again, were you part of Gary's program?" implying she knows Defendant Stewart well. In addition, she asked Plaintiff to tell her about the worst manager she'd ever had. She told Plaintiff she enjoyed the interview but never followed up with a decision on whether to move forward with a job offer.

76.    Between September and November 2023 Semple from the Defendant Trinet did try on several occasions to meet with Plaintiff under the pretext of involving Plaintiff in the New York City startup community. Plaintiff acquiesced to a virtual meeting after seeing Semple send her an email to her direct email address, which she'd never provided to Semple. The conversation was scheduled for November 7, 2023, roughly two weeks after Plaintiff had applied for unemployment benefits. Twelve hours following that conversation, the unemployment office emailed Plaintiff to notify her that they "had received information that Plaintiff has returned to work" and were going to audit her unemployment claim, which Plaintiff reasonably understood was a result of stating she's supporting fund managers in her spare time in response to Semple asking Plaintiff about what she was up to. Plaintiff had not returned to work, and it was in this moment that Plaintiff understood Trinet, as an agent of Techstars, was working to retaliate against her by attempting to stall/deny her due unemployment benefits. In fact, Plaintiff only received unemployment monies after appealing to her state senator and about 13 weeks after filing for unemployment, putting her under financial duress. In the determination letter from the unemployment office after 13 weeks of no disbursement, the office stated that it completed its investigation, and while it did not arrive to the level of willful misconduct, Plaintiff was discharged by Defendant for "disruptive influence/conduct toward my manager," the very same language used by Defendant in the EEOC position statement received 1 day after the

unemployment office letter. It is evident that Defendants did stall and attempt to deny Plaintiff due unemployment monies as a retaliatory measure.

77. *Economic damages:*  As a consequence of Defendants' conduct, Plaintiff has suffered and will suffer harm, including lost past and future income and employment benefits, damage to her career, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which those wages should have been paid, in a sum to be proven at trial.

78. *Non-economic damages:*  As a consequence of Defendants' conduct, Plaintiff has suffered and will suffer psychological and emotional distress, humiliation and mental and physical pain and anguish, in a sum to be proven at trial.

79. *Punitive damages:*  The conduct of Defendants was base, outrageous, contemptible, and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages under federal law. In addition, Defendants' conduct constitutes malicious, willful, wanton and/or reckless indifference to Plaintiff protected rights, entitling Plaintiff to punitive damages against Defendants under State law.

80. *Attorneys' fees:*  Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

## FIRST CAUSE OF ACTION

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, *et seq*., For Discrimination Based on Plaintiff's Race, Color, National Origin and Gender — Against All Defendants**

81. The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

82.     Defendants' conduct, as alleged, violated Title VII. Defendants committed unlawful employment practices, including by the following bases for liability:

- Taking adverse employment actions against Plaintiff, such as discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, national origin and gender in violation of Title VII; and

- Plaintiff's race, color and/or national origin and gender were motivating factors in, among other things, Defendants' decision to ignore Plaintiff's good faith complaints about discrimination and ultimately terminating Plaintiff.

83.     As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

84.     As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress and physical and mental pain and anguish, all to her damage in a sum according to proof.

85.     Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

86.     Defendants' conduct constitutes malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights entitling Plaintiff to punitive damages against Defendants.

## <u>SECOND CAUSE OF ACTION</u>

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, *et seq*., For Retaliation — Against All Defendants**

87.     Plaintiff hereby repeats and re-alleges each allegation contained in the paragraphs

above as if fully set forth herein.

88.     Plaintiff engaged in protected activities when she made multiple complaints of discrimination and harassment based on her race, color and/or national origin and gender to Defendants' management and HR services provider, TriNet, including, but not limited to, her direct manager, Defendant Stewart and Semple of TriNet.

89.     As a result of these complaints, Plaintiff experienced adverse employment actions, including, but not limited to, being ignored, subjected to a hostile work environment, excluded from key events and ultimately terminated. Such conduct demonstrates Defendants' reckless indifference to the laws prohibiting discrimination and retaliation.

90.     By the acts and practices described above, Defendants retaliated against Plaintiff for engaging in protected activities in violation of Title VII.

91.     As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

92.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## **THIRD CAUSE OF ACTION**

**Violation of New York State Human Rights Law for Discrimination Based on Race, Color, National Origin and Gender — Against All Defendants**

93.     The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

94.     The New York Executive Law §296(1)(a) provides that: "It shall be an unlawful discriminatory practice for an employer or licensed agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic

characteristics, marital status, or domestic violence victim status, to refuse or hire or employ or to bar or to discharge from employment such individual in compensation or in terms, condition or privileges of employment."

95.     Defendants' conduct, as alleged, violated the New York State Human Rights Law, including, but not limited to, N.Y. Exec. Law § 296. Defendants committed unlawful employment practices, including but not limited to, the following bases for liability:

- Taking adverse employment actions against Plaintiff, such as discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, national origin, gender and/or other good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296;

- Harassing Plaintiff and/or creating a hostile work environment in whole or in part on the basis of Plaintiff's race, color, national origin, gender and/or good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law §296;

- Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on Plaintiff's race, color, national origin, gender and/or other good faith complaints, and/or other protected characteristic or activity in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296;

96.     Plaintiff's race, color, national origin and gender were motivating factors in Defendants' decision to terminate Plaintiff's employment, not to retain, hire, or otherwise employ Plaintiff in any position, and/or to take other adverse job actions against Plaintiff.

97.     Defendants' conduct, as alleged, violated the New York Civil Rights Law, including, but not limited to, N.Y. Civ. Rights § 40-c by subjecting Plaintiff to discrimination in her civil rights and/or to harassment.

98.     As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of

earnings and other employment benefits.

99.    As a proximate result of Defendants' willful, knowing, and intentional discrimi-nation against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

100.    Defendants' conduct constitutes malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights, entitling Plaintiff to punitive damages against Defendants.

**<u>FOURTH CAUSE OF ACTION</u>**

**Violation of New York State Human Rights Law for Retaliation for Opposing Discrimination Based on Race, Color, National Origin and Gender — Against All Defendants**

101.    The allegations set forth in the foregoing paragraphs are re-alleged and incorpo-rated herein by reference.

102.    Defendants' conduct, as alleged, violated the New York State Human Rights Law, specifically N.Y. Exec. Law sections 296(1)(e) and 296(7), and Defendants committed unlawful employment practices, including by the following, separate bases for liability:  retaliating against Plaintiff by ignoring Plaintiff's good faith complaints about discrimination based on race, color, national origin, and gender, ultimately terminating Plaintiff for seeking to exercise rights guaranteed under the New York State Human Rights Law and for opposing Defendants' failure to provide such rights, including the right to be free from discrimination and harassment based on race, color, national origin, and gender, in violation of New York State Human Rights Law sections 296(1)(e) and 296(7).

103.    Plaintiff is entitled to all available compensation under the New York State Human Rights Law.

104.     Defendants' conduct, as alleged, violated the New York Civil Rights Law, including but not limited to, N.Y. Civ. Rights § 40-c by subjecting Plaintiff to discrimination in her civil rights and/or to harassment.

105.     Under the New York State Human Rights Law, as a proximate result of Defendants'' unlawful conduct, Plaintiff is entitled to compensatory damages in an amount according to proof.

106.     Under the New York State Human Rights Law, as a proximate result of Defendants'' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits, in an amount according to proof.

107.     Under the New York State Human Rights Law, as a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

## **FIFTH CAUSE OF ACTION**

**Violation of the New York City Human Rights Law for Discrimination on the Basis of Race, Color, National Origin and Gender – Against All Defendants**

108.     The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

109.     The New York City Administrative Code §8-107(1)(a) provides that it is an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the actual or perceived race, color, national origin, gender, or any other protected characteristic, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment.

110.   Plaintiff was discriminated against based on her race, color, national origin and gender, which are considered protected characteristics under the NYCHRL.

111.   Defendants' conduct violated the NYCHRL. They committed unlawful employment practices by discriminating against the plaintiff due to her race, color, national origin and gender. This includes Defendants' exclusion of the plaintiff from key events, their poor handling of her complaints, and the creation of a hostile work environment.

112.   Plaintiff was subjected to comments and actions that questioned her racial background and identity as well as her gender. These incidents created an uncomfortable and hostile work environment, contributing to the adverse employment actions taken against her.

113.   As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

114.   As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

115.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

116.   As a direct and proximate result of Defendants' harassment, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

## SIXTH CAUSE OF ACTION

**Violation of New York City Human Rights Law for Retaliation for Engaging in Protected Activities — Against All Defendants**

117.    The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

118.    New York City Administrative Code §8-107(7) provides that it is an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has opposed any practice forbidden under this chapter.

119.    Plaintiff made multiple complaints and experienced adverse employment actions as a result, including but not limited to: discriminatory treatment due to her race, color, national origin and gender. Despite her qualifications and performance, she faced harassment from management and was subjected to a hostile work environment.

120.    Following her complaints, Plaintiff experienced adverse employment actions, including, but not limited to, the withholding of critical information necessary for her job performance and exclusion from key team events and meetings.

121.    By the acts and practices described above, Defendants retaliated against Plaintiff for engaging in protected activities, in violation of the NYCHRL.

122.    By the above-described unlawful conduct, Defendants retaliated against Plaintiff for engaging in protected activities, in violation of the NYCHRL.

123.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities, and other prerequisites of employment.

124.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation,

emotional distress and pain and suffering, humiliation, and damage to reputation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff TANAKA MAWINDI respectfully requests that this Court grant judgment, as follows:

(a)     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violated the laws of the United States and State of New York;

(b)     An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

(c)     An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including but not limited to, compensation for Plaintiff's emotional distress;

(d)     For general and special damages according to proof;

(e)     For exemplary damages, according to proof;

(f)     For pre-judgment and post-judgment interest on all damages awarded;

(g)     For reasonable attorneys' fees;

(h)     For costs of suit incurred;

(i)     For an award of punitive damages in an amount to be determined at trial;

(j)     For an award of pre-judgment interest on all amounts due; and

(k)     For such other and further relief as the Court may deem just and proper.


Dated:  June 21, 2024                    SHEGERIAN & ASSOCIATES


                                         By:   _Olivia Clancy_____
                                         Olivia M. Clancy, Esq.
                                         *Attorneys for Plaintiff*
                                         **TANAKA MAWINDI**

90 Broad Street, Suite 804
New York, New York 10004
Tel.: (212) 257-8883
Fax: (212) 804-7299
oclancy@shegerianlaw.com

## <u>VERIFICATION</u>

    I, Tanaka Mawindi, being duly sworn, depose and say that I am the Plaintiff in this action and that I have read the foregoing Summons, Complaint and Demand for Jury Trial; the same is true to my own knowledge, except as to those matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true.


                                    _____
                                      Tanaka Mawindi